# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0668V

|  |  |
|---|---|
| KATHLEEN KELEHER,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: December 19, 2024 |

*Joseph Alexander Vuckovich, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.*

*Mitchell Jones, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On January 12, 2021, Kathleen Keleher filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, following the administration of a tetanus, diphtheria, acellular pertussis vaccine ("Tdap") in her left deltoid on June 9, 2020. Petition at 1, ¶¶ 1, 9-10. The case was assigned to the Special Processing Unit ("SPU") of the

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Office of Special Masters. Respondent conceded entitlement, but the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount $**180,000.00, reflecting actual pain and suffering.** The parties have also agreed Petitioner is entitled to **$7,112.40 for unreimbursed expenses**.[4]

**I.    Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of*

---

[3] Approximately five and one-half months after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed July 13, 2023, ECF No. 44.
.
[4] Initially, Respondent opposed Petitioner's Request for $6,663.00 in past unreimbursed expenses. Respondent's Response to Petitioner's Memorandum in Support of Damages ("Opp.") at 10; *see* Petitioner's Memorandum in Support of Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Brief") at 11; Exhibits 12-13. Respondent countered that Petitioner should receive only $4,839.99, but failed to stated which specific expenses he opposed. Opp. at 11. In her reply, Petitioner amended her request to include mileage costs in the amount of $449.40, resulting in a new total of $7,112.40. Petitioner's Reply Memorandum in Support of Brief ("Reply") at 8-9. By email communication in August 2024, the parties alerted me that Respondent no longer objected to the full amount of past unreimbursed expenses Petitioner seeks. *See* Informal Remark, dated Aug. 12, 2024.

*Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.    Prior SIRVA Compensation Within SPU[5]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 4,016 of these cases, with the remaining 122 cases dismissed.

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

---

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

### B.     Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory cap on actual and future pain and suffering.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section (f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

5

### III.  The Parties' Arguments

The only disputed damages component is the amount to be awarded for Petitioner's pain and suffering. Petitioner seeks $205,000.00. Brief at 11; Reply at 9. In contrast, Respondent argues for an award of only $127,500.00. Opp. at 10.

In support of a higher award, Petitioner emphasizes the treatment she received, which she describes as extensive (involving a Medrol dose pack, x-rays, two surgeries under general anesthesia, and 42 sessions of physical and occupational therapy ("PT and OT")). Brief at 8. Characterizing her SIRVA as severe, she maintains that "the duration of her symptoms was approximately two and a half to three years." *Id.* at 8-9. She favorably compares the facts and circumstances in this case to those suffered by the petitioners in *Pruitt* and *Lavigne*[12] - decisions featuring past pain and suffering awards of $185,000.00 and $198,000.00, respectively. Brief at 9-10

Respondent emphasizes Petitioner's representation, made in early January 2022, approximately 19 months post-vaccination, that she was "mostly pain free, reporting that her shoulder felt 'really good overall.'" Opp. at 8-9 (citing Exhibit 10 at 92-93). Respondent does not cite any comparable SIRVA cases, but distinguishes the cases cited by Petitioner. *Id.* at 9. He insists that the *Pruitt* petitioner's SIRVA was more severe and involved "significantly more extensive treatment," and that the timing of the *Lavigne* petitioner's surgeries (less than three weeks and six months post-vaccination) "evidence[es] a more significant injury and more immediate onset." *Id.*

In her reply, Petitioner criticizes Respondent's reliance on one statement made by her in January 2022. Reply at 4. She notes that in that same record, she stated that she was still attending PT, and was not fully recovered. *Id.* She emphasizes that she still exhibited some limited ROM and reported difficulties carrying a bag at her last occupational therapy ("OT") session in March 2022, and chronic left shoulder pain mentioned in the medical records from visits in August and December 2022. *Id.* at 4-5.

### IV.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

---

[12] *Pruitt v. Sec'y of Health & Hum. Servs.,* No. 17-0757V, 2022 WL 10075415 (Fed. Cl. Spec. Mstr. Sept. 15, 2022); *Lavigne v. Sec'y of Health & Hum. Servs.,* No. 19-1298V, 2022 WL 2275853 (Fed. Cl. Spec. Mstr. May 12, 2022).

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Keleher suffered a moderate SIRVA injury that required a Medrol dose pack, one MRI, two arthroscopic surgeries (four- and 18-months post-vaccination), and three courses of PT/OT (before and after her two surgeries - involving 11 to 17 sessions each time). Exhibit 6 at 11-24, 55-297; Exhibit 10 at 50-65, 76-99, 136-354. During the initial phase of her injury, Petitioner reported only mild to moderate pain levels (four or less) at the completion of her therapy sessions.[13] She recounted a pain level of five on only two occasions: October 21, 2020 (six days after her first surgery), and December 30, 2020 (the last PT session following her first surgery). Exhibit 6 at 21, 99.

On December 28, 2020, Petitioner's orthopedist opined that Petitioner had developed adhesive capsulitis (commonly known as a frozen shoulder), and would require a second surgery. Exhibit 6 at 27; *see id.* at 21 (PT record discussing these events). Despite being medically cleared for surgery in late January 2021 (*id.* at 11-19; Exhibit 10 at 987-1001), the second surgery was delayed for approximately ten months due to issues with insurance and a right tibial plateau fracture[14] that required both surgery and PT through October 2021. Exhibit 10 at 426-29, 440-986. Her pain and suffering was, no doubt, heightened by this delay.

Petitioner obtained good relief, however, from her second arthroscopic surgery – a capsular release and manipulation performed on November 23, 2021. Exhibit 10 at 202-358 (pre-op and surgery records). Thus, six days post-surgery, Petitioner "[s]tate[d] her shoulder feels better at this point in recovery compared to prior surgery." *Id.* at 179. At OT sessions thereafter, Petitioner reported pain levels ranging from one to two out of ten, with only one instance of a slightly higher level (three out of ten).[15] By her last orthopedic visit on January 3, 2022, she reported that she rarely needed over the counter pain medication. *Id.* at 93. The orthopedist noted that Petitioner was making good progress

---

[13] Exhibit 6 at 55-56, 62-63, 66-67, 70-71, 74-75, 82-83, 86-87, 94-95, 102, 280, 239, 241, 246, 248, 251-52, 256-57, 259, 261, 263-64, 267-68, 271-72, 276, 279-80, 283.

[14] Tibial is the adjective for the tibia which is "the shin bone: the inner and larger bone if the leg below the knee." Dorland's Illustrated Medical Dictionary ("Dorland's") at 1927 (32th ed. 2012).

[15] Exhibit 10 at 58, 60, 81-82, 86, 89-90, 114-15, 137-38, 141-42, 145-46, 149-50, 153, 166-67, 170-71, 174-75. On January 26, 2022, Petitioner reported a pain level of three out of ten, along with increased soreness after her last session and tightness in her neck during the last few days. *Id.* at 77.

7

but still needed improvement in ROM. *Id.* At her last OT session on March 1, 2022, Petitioner reported no pain. *Id.* at 51, 53. She was assessed as having met all her goals and exhibiting movement "within functional limits for most activities at home and work." *Id.* at 53.

Chronic left shoulder pain was included in the active problem list in medical records from visits through December 2022. Exhibit 10 at 37-38 (annual physical in May 2022), 11 (dermatology visit in August 2022); Exhibit 11 at 27 (December 2022 orthopedic visit for her knee injury). However, this condition is also listed under "*Past* Medical History" in the medical records from the May 2022 physical. Exhibit 10 at 38 (emphasis added). More importantly, Petitioner reported no current symptoms, and received no treatment for this condition during these appointments. Exhibit 10 at 5-19, 36-49; Exhibit 11 at 26-29. Thus, the record is not supportive of Petitioner's contention that her SIRVA lasted more than two years. Rather it shows a SIRVA injury lasting approximately 21 months.

The comparable cases proposed by Petitioner offer some guidance, but there are differences that necessitate a lower pain and suffering award in this case. The *Pruitt* petitioner, for example, pursued treatment for more than four years – twice the injury duration of this case. *Pruitt,* 2022 WL 10075415, at *8-9. And the special master in that case determined that the significant gap in treatment was more likely due to the Petitioner's lack of insurance during that time, rather than a reduction or cessation of symptoms. *Id.* at *9. Similarly, the *Lavigne* petitioner's SIRVA was more severe, involving a vaccine reaction that resulted in significant pain and limits in mobility. *Lavigne,* 2022 WL 2275853, at *1-3. Substantial scar tissue was observed during both surgeries the *Lavigne* petitioner underwent. *Id.* at *2.

Instead, I find the facts and circumstances in this case more closely resemble those in *Maxfield*[16] – a case involving an award of $185,000.00. However, the *Maxfield* petitioner suffered several periods of more severe pain, and experienced a new rotator cuff tear following her first surgery. Thus, Petitioner's past pain and suffering award should be slightly lower.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $180,000.00 represents a fair and appropriate amount of**

---

[16] *Maxfield v. Sec'y of Health & Hum. Srvs.,* No. 21-0869V, 2024 WL 1999662 (Fed. Cl. Spec. Mstr. Apr. 4, 2024) (incorporating the transcript into this short-form decision).

compensation for Petitioner's actual pain and suffering.[17] **I also find that Petitioner is entitled to $7,112.40 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $187,112.40 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.